# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

ANGEL D. MITCHELL,

        Plaintiff,

        v.                              Case No. 04-CV-353

GE HEALTHCARE,

        Defendant.

_____

## ORDER

On April 8, 2004, plaintiff Angel D. Mitchell ("Mitchell") filed her complaint in this action alleging she was discriminated against by her employer, GE Healthcare ("GEHC"), on the basis of her religion and her disability. Mitchell's complaint sets forth claims under the Americans with Disabilities Act ("ADA") and a claim of religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., however, she withdrew her Title VII claim on March 16, 2006. Mitchell's remaining claims are that GEHC failed to reasonably accommodate her alleged disability of headaches and retaliated against her in violation of the ADA. On May 1, 2006, GEHC filed a motion for summary judgment. The matter became fully briefed on July 7, 2006, and the case was assigned to this court on November 2, 2006. For the reasons stated below, the court will grant GEHC's motion for summary judgment.

## BACKGROUND

The material facts of the case are not in dispute. The defendant, GEHC, manufactures and sells medical equipment. The plaintiff, Mitchell, began working for GEHC in 1978 as a production associate. During the 1990's, Mitchell worked at GEHC's Ryerson Road facility in New Berlin, Wisconsin. In 2000, Mitchell moved from the Ryerson Road facility to GEHC's facility in Waukesha, Wisconsin, where she worked on the second shift in the detector operations department. From August 1999 through June 2003, Mitchell was supervised by production team leader James Winski ("Winski").

Mitchell and the other production associates in the detector operations department worked in a "clean room," a room that requires special ventilation and procedures to maintain a low level of dust and other particles that could damage the detectors being produced. From 1999 through 2003, GEHC employed approximately 20 employees on the second shift in the detector operations department. GEHC trained production associates on various tasks based on the specific needs of the department. GEHC did not train production associates based on seniority. Mitchell asked to be trained on a process called module final, but Winski told Mitchell that he had planned to train her on a different process instead. Although Mitchell had a sufficient amount of work performing the tasks she was already trained to do, Mitchell's request was granted and she was eventually trained on the module final process. (Winski Dep. 24; Mitchell 2006 Dep. 59.)

-2-

GEHC allowed employees to listen to their own radios in areas where it was considered safe for employees to listen while working, including the clean room. Winski believed that permitting radios in the clean room actually improved productivity because of the repetitive and sometimes mundane nature of work performed there. (Winski Dep. 26.) Mitchell brought her own radio into the clean room in 2000. (Mitchell 2006 Dep. 55.) In order to keep the employees' use of personal radios from becoming disruptive, in 1998, GEHC promulgated "Guidelines for Radio and Stereo Usage" for the clean room. (Kingsley Aff. Ex. A.) The guidelines stated that personal radios and stereos were permitted, the use of headphones was encouraged whenever possible, and radios were not to be played at a volume louder than manufacturing noise in the department. (*Id.*) In the clean room, Winski followed the radio use guidelines and determined that if radio noise interfered with a conversation or was clearly audible to a person 10 to 20 feet away from where the radio was being played, the volume level was unacceptable. (Winski Dep 10.) When a radio was being played too loudly, Winski would ask the employee to turn his or her radio down. (Winski Dep. 20-21.) Winski states that the clean room employees were insistent that radios be permitted in the clean room, however, no employee ever refused his directive to turn his or her radio down. (*Id.*)

On March 3, 1999, Mitchell wrote an e-mail to the then chief executive officer of GEHC, Jeffrey Immelt, to complain about the loudness of some of the radios in the clean room. (Kingsley Aff. Ex. B.) Mitchell stated that she did not want the

-3-

radios removed from the clean room, but that she wanted to be able to work without distractions. (*Id.*) Mitchell's concern was forwarded to Fred Kingsley ("Kingsley"), manager of union relations, and Kingsley met with Mitchell on March 9, 1999, to discuss several possible solutions regarding her complaints about radio noise. Kingsley and Mitchell discussed the possibility of setting a specific decibel level limit for all personal radios, re-communicating the radio use guidelines, and training all new supervisors on acceptable radio volume. Following the March 9, 1999 meeting, GEHC agreed to re-communicate its radio use guidelines and to coach supervisors on acceptable radio volume. (Kingsley Aff. ¶ 7.)

By late 1999, Mitchell began to complain regularly about the volume of her coworkers' radios. When Mitchell found a coworker's radio volume to be unacceptable, she would contact her supervisor, Winski. Mitchell states that Winski did not take her complaints seriously and that GEHC did not take steps to reduce the volume of the radios played by her coworkers. (Taylor Aff. ¶ 9, 12, 13, 17.) Winski states that he took all of Mitchell's complaints concerning radio noise seriously and when he was available to do so, he investigated each of her complaints; however, when he checked the volume of the other employees' radios, he found that they were almost always at acceptable levels. (Winski Aff. ¶¶ 12-13; Winski Dep. 38-39.) Winski also states that many times when Mitchell complained, Winski could hear normal conversations taking place across the room more clearly than radios located closer to him. (Winski Aff. ¶ 13.) Winski estimated at his deposition that 90% of the

time he responded to Mitchell's complaints about radio noise he found the noise levels to be acceptable, and the other 10% of the time he found that the radios were not even turned on. (Winski Dep. 38-39.)

To monitor the radio volumes in the clean room, Winski would frequently drop in unannounced and enter the clean room through the back door. (Winski Dep. 38; Winski Aff. ¶ 14.) On numerous occasions, Winski discovered Mitchell's radio was "blaring." (Winski Aff. ¶ 15.) Other times, Winski discovered that other employees' radio volumes were too high, and he asked the employees to turn their radio volumes down. (Winski Dep. 39.) Winski believed the employees complied with his requests and he never reentered the clean room to find that the employees had turned their radio volumes back up to unacceptable levels. (Winski Dep. 21.) Mitchell states that these measures were not effective in keeping her coworkers' radio volumes at an acceptable level. (Mitchell Aff. ¶¶ 24, 39; Taylor Aff. ¶¶ 8, 13.)

On December 9, 1999, Kay Schmidt ("Schmidt"), a manager of detector operations, and Mitch Halstead ("Halstead"), a union committee representative, met with Mitchell to discuss her radio noise concerns. During this meeting, Mitchell complained that she had pain due to a sinus infection, and Mitchell states that she also complained about migraine, sinus, and stress headaches at the meeting. (Schmidt Aff. ¶ 4; Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 9.) At the conclusion of the meeting, Schmidt proposed that GEHC re-communicate the radio use guidelines to the detector operations department and also conduct noise

sampling in the clean room in 2000. (Schmidt Aff. ¶ 5.) Mitchell agreed to this proposal. (*Id.*)

On December 16, 1999, and on January 9, 2000, Mitchell, Winski, Fred Krammer ("Krammer"), a union relations specialist, and Mike Pasdo ("Pasdo"), a business team leader, met to discuss Mitchell's radio noise concerns. Mitchell stated at these meetings that she wanted the radio noise to be at a level where it was not annoying to her, she complained about pain in her ear from her sinuses, and stated at the December 16, 1999 meeting that the radio noise made it difficult for her to concentrate when she was working with razor blades. (Krammer Aff. ¶¶ 4, 9.) In both meetings, Krammer offered Mitchell the option of wearing headphones as hearing protection, however, Mitchell declined the offers to use the headphones. (*Id.* at ¶¶ 7, 10.) Krammer told Mitchell that the clean room was a safe work environment with regard to noise levels and that there was no proven inability to work with razor blades while being exposed to radio noise. (*Id.* at ¶ 8.) Krammer also suggested that Mitchell see GEHC's physician regarding her complaints with the radio noise. (*Id.* at ¶¶ 5, 10.)

In January 2000, GEHC placed a docimeter, a device that measures sound as perceived by the ear, in the clean room. Although the radios were turned up louder than Winski would have normally permitted, the monitoring showed that the radios were being played at levels well below the level at which the Occupational Health and Safety Administration ("OSHA") requires ear protection and below the

recorded levels of the clean room's ventilation system, normal conversations, and equipment. (Schmidt Aff. ¶ 8; Winski Dep. 40; Winski Aff. ¶ 17.) The docimeter monitoring, which GEHC planned to conduct over 2 weeks, took place over 3 days because Mitchell indicated to Schmidt that the noise level as maintained during the monitoring was acceptable and that the issue was resolved. (Schmidt Aff. ¶ 7.)

In March 2000, Mitchell complained to Winski again that the radios were too loud, and Winski continued to check noise levels in the clean room after receiving these complaints. (Winski Aff. ¶ 18.) At this time, GEHC began receiving complaints from Mitchell's coworkers that her disagreement over the radio noise issue was becoming intimidating and disruptive. (*Id.* ¶ 19.) Based on Mitchell's coworkers' complaints, Krammer, Halstead, and Winski met with 6 of Mitchell's coworkers on March 20, 2000, to discuss Mitchell's conduct. The employees reported that there had been no change in the radio volume since the docimeter readings were taken, however, Mitchell engaged in intimidating behavior like glaring at her coworkers, turning others' radios down when they left the room, and demanding that radios that were not even turned on be turned down. (Krammer Aff. ¶ 13.) A number of employees also reported that they had either taken vacation days or declined overtime in order to avoid Mitchell due to her alleged disruptive conduct concerning the radio noise. (*Id.*) Mitchell states, however, that she did not threaten, intimidate, or act inappropriately when she asked her coworkers to reduce the volume of their radios. (Taylor Aff. ¶ 14; PPFOF ¶ 32.)

-7-

On March 21, 2000, Krammer, Winski, Pasdo, Halstead, and a union representative met with Mitchell to tell her that they needed to resolve the radio issue and stated that after multiple investigations, there was no evidence to suggest that the radio noise levels were any different from the levels she found acceptable during the monitoring period, or that her coworkers were "playing games with her." (Krammer Aff. ¶ 14.) Krammer informed Mitchell that several of her coworkers had been complaining about her conduct and indicated that her conduct was negatively affecting her coworkers' productivity. (*Id.* at ¶ 15.) Krammer handed Mitchell ear protection headphones, however, without giving a reason why, Mitchell stated that she was not going to accept the headphones. (*Id.* ¶ 16.) At the conclusion of the meeting, Mitchell was told that the radio noise issue was "closed," and that any future intimidating or disruptive conduct relating to the radio noise issue would result in a mandatory referral to an Employee Assistance Program and GEHC's medical department. (*Id.* ¶ 17.) GEHC refers employees to its Employee Assistance Program when the employee engages in inappropriate workplace behavior and when verbal counseling and disciplinary action have not successfully changed the inappropriate behavior. (Weide Aff. ¶ 12.) Mitchell was further advised that if she had any additional issues she wanted to discuss, she should raise these issues with her supervisor, Winski. (Krammer Aff. ¶ 17.)

Despite these efforts to resolve Mitchell's complaints about radio noise, on August 28, 2000, Mitchell called Winski into the clean room 3 times to investigate

Case 1:04-cv-00353-JPS    Filed 02/23/07    Page 8 of 35    Document 83

radio noise, and on all 3 occasions, Winski found the radio volume to be acceptable. (Winski Aff. ¶ 20.)  But the next time Winski entered the clean room, he found that the volume of Mitchell's radio was much higher than the volumes of the other radios that were on in the room.  (*Id.*)  Winski walked to a workstation 20 feet away from Mitchell's workstation and could only hear her radio playing.  (*Id.*)  When Winski asked Mitchell to turn her radio down, Mitchell refused, stating that she would not turn her radio down unless everyone else did as well.  (*Id.* at ¶ 21.)  Winski and Mitchell then spoke in private where Winski again offered Mitchell hearing protection which Mitchell refused.  (*Id.*)

In April 2001, Karla Bucio ("Bucio"), one of Mitchell's coworkers in the clean room, complained about Mitchell's conduct to Daniel Weide ("Weide"), the senior labor relations specialist in the union relations department.  Bucio reported that Mitchell engaged in intimidating conduct through her body language, stares, glares, and arguments with coworkers over radio noise.  (Weide Aff. ¶ 7.)  Bucio also stated that Mitchell would often play her radio loudly to drown out her coworkers' radios.  (*Id.*)  Based on this complaint and Mitchell's complaints about radio noise, which had continued since 1999, Weide and Halstead conducted interviews with five of Mitchell's coworkers.  (Weide Aff. ¶ 8, Ex. A.)  Mitchell's coworkers reported that in the past several weeks, Mitchell's radio had been louder than anyone else's, and that Mitchell intimidated them through stares and glares and by yelling about the radio noise.  (Weide Aff. ¶ 8.)  The coworkers also reported that their productivity

was negatively affected by Mitchell's conduct. (*Id.*)

On April 23, 2001, Winski asked Mitchell to come into his office to discuss a workplace situation. Mitchell refused to go with Winski and stated that she would go to his office "when she was ready." (Winski Aff. ¶ 23.) GEHC considered Mitchell's conduct to be a refusal to follow a work order and disrespectful conduct toward management. (Weide Aff. ¶ 9.) Based on this incident, and the information received from Mitchell's coworkers, GEHC issued Mitchell a hearing warning notice on April 26, 2001, and a hearing was held the same day. (Weide Aff ¶ 10; Weide Aff. Ex. B.) GEHC holds disciplinary hearings to give employees the opportunity, with union representation present, to tell their side of the story.

At the April 26, 2001 hearing, with her union representatives present, Mitchell denied any wrongdoing, but acknowledged raising her voice to Winski. (Weide Aff. ¶ 11, Ex. C.) GEHC's management representatives at the hearing determined that Mitchell had intimidated her coworkers, had been disrespectful toward management by raising her voice, and had refused to follow a work directive by refusing to report to Winski's office when told to do so. (Weide Aff. Ex. C.) At the conclusion of the hearing, GEHC issued Mitchell a mandatory referral to its Employee Assistance Program and placed her on a leave of absence. (Weide Aff. ¶ 11.) Mitchell was paid as part of a grievance settlement for the time she was placed on the leave of absence due to her referral to the Employee Assistance Program. (*Id.* at ¶ 13.) Once she completed the Employee Assistance Program's recommended action,

-10-

which included counseling sessions, Mitchell was released to return to work on June 16, 2001. (*Id.*)

In preparation for Mitchell's return to work, Weide, Kingsley, Winski, and Lori Vicich, a manager in detector operations, decided that several issues needed to be reinforced with Mitchell regarding her conduct toward her coworkers. Accordingly, Weide drafted a "zero tolerance" warning to be read to Mitchell outlining GEHC's expectation that she would abide by its work rules and that she would be eligible for discipline if she violated these rules. (*Id.* at ¶ 14.) Mitchell was not required to sign the zero tolerance warning and it was not placed in her personnel file. (*Id.*; Mitchell 2006 Dep. 66-67.)

GEHC states that despite Mitchell's completion of the Employee Assistance Program and the zero tolerance warning, Mitchell continued to act inappropriately toward her coworkers in the clean room. (Winski Aff. ¶ 24; Defendant's Proposed Findings of Fact ("DPOF") ¶ 125.) For example, in August 2001, Bucio alleged that Mitchell's conduct was similar to what it had been in April 2001, prior to her referral to the Employee Assistance Program, and Mitchell continued to glare and yell at coworkers, and she created tension with an uncooperative attitude. (Winski Aff. ¶ 24.) Winski also states that Mitchell continued to act inappropriately after she returned from her leave of absence. For example, Winski states that when a coworker asked to use a work cart, Mitchell became upset and pushed the cart 6 feet across the floor in the direction of the coworker. (Winski Aff. ¶ 25, Ex. A.)

Winski also states that Mitchell continued to complain about radio noise even though Winski found the volume levels to be acceptable. (*Id.* at ¶ 26.) Winski estimates that between 2000 and 2003, Mitchell complained about radio noise an average of 2 to 3 times per shift, and on each occasion, Winski investigated the noise levels and found them to be acceptable. (Winski Dep. 13; Winski Aff. ¶ 26.) Mitchell maintains, however, that her coworkers' radios were often loud and that she did not act inappropriately toward her coworkers when she asked them to reduce the volume of their radios. (Taylor Aff. ¶¶ 8-17; PPFOF ¶ 32.)

As a result of Mitchell's coworkers' continued complaints, Weide and Leo Reisinger, the union shop chairman, conducted another round of interviews with the clean room employees on August 7, 2001. One of Mitchell's coworkers, Cheryl Taylor ("Taylor"), indicated that she did not have any information to share. (Weide Aff. ¶ 17.) Five other clean room employees indicated that Mitchell's conduct had created a tense environment. (*Id.* at ¶ 18, Ex. D.) These employees stated that Mitchell refused to share work equipment, engaged in staring and glaring, continued to press the radio issue, and had an overall negative impact on production. (*Id.*) The employees also reported turning down overtime assignments and taking vacation days in order to avoid Mitchell. (*Id.*)

By October 2001, Winski had documented additional instances where he thought Mitchell's conduct was disruptive and uncooperative. For example, on October 8, 2001, a GEHC engineer was instructing certain employees in the clean

-12-

room on the module final process but Mitchell's radio was so loud that people in the meeting could not hear the engineer, and one of the employees had to ask Mitchell to turn her radio down. (Winski Aff. ¶ 27, Ex. B.) And on October 30, 2001, after being instructed by Winski to perform a task, Mitchell refused to do the task until the next day. (*Id*.) A few days later, on November 2, 2001, Mitchell called Winski to complain about a coworker's radio volume. (*Id*. at ¶ 28.) Winski states he investigated the complaint and that he could barely hear the coworker's radio, yet Mitchell continued to insist that the coworker turn her radio volume down. (*Id*.) As a result, the coworker left her workstation and Winski found the coworker outside crying and visibly shaking due to Mitchell's conduct. (*Id*.) Mitchell, however, states in her affidavit that after 2000, she did not talk with her coworkers about the volume of their radios . (Mitchell Aff. ¶ 49.)

After this incident, Winski told Mitchell that if radio noise was bothering her, she should wear hearing protection. (Winski Aff. ¶ 29.) Mitchell stated she would not use headphones because doing so would mean she could not hear her own radio. (*Id*.) Winski then told her to use radio headphones if she wanted to hear her music, but Mitchell stated she would not wear radio headphones unless everyone else did as well. (*Id*.) In her affidavit, Mitchell states that she did not wear headphones because they exacerbated her headaches. (Mitchell Aff. ¶ 16.)

Winski believed that Mitchell's behavior concerning the radios had regressed to where it was prior to her referral to the Employee Assistance Program, except

-13-

Mitchell now used her own radio to drown out her coworkers' radios. As a result, Weide, Winski, Kingsley, and Mike Martincich, the business team leader in operations, issued Mitchell another warning notice on Friday, November 9, 2001. (Weide Aff. Ex. E.) The warning cited Mitchell's continued violations of GEHC's work rules by intimidating her coworkers, being disrespectful toward management representatives, and refusing to follow directions. (*Id.*) The warning stated that Mitchell was suspended pending a hearing concerning her conduct, which was held the following Monday on November 12, 2001. (*Id.*) At the conclusion of the hearing, Mitchell was presented with and signed a "last chance agreement." (Weide Aff. Ex. F.) As a condition of the last chance agreement, in order to keep her job at GEHC, Mitchell was required to conduct herself in a nonthreatening manner and to follow management's instructions and GEHC's work rules. (*Id.*) From the time Mitchell signed the agreement in November 2001 until she left GEHC in 2005, Mitchell was not formally disciplined by GEHC in any way. (Weide Aff. ¶ 22.) At the time GEHC presented the last chance agreement to Mitchell, Mitchell had not provided GEHC any information from her physician indicating a diagnosis of any kind or suggesting that she required an accommodation due to radio noise. (Weide Aff. ¶ 23.)

On September 4 and 5, 2002, GEHC again conducted noise testing in the clean room. The sampling, which included areas where radios were playing, showed sound levels ranging from 30-45 decibels, levels equivalent to those found in a library or the hum of a refrigerator. (Weide Aff. Ex. G.) Mitchell states that the

volume of the radio noise was not related to the effect the noise had on her headaches. (PPFOF ¶ 23.)  In 2002 and 2003, Mitchell continued to complain about radio noise in the clean room.  (Winski Aff. ¶ 31.)  For example, on February 28, 2003, Mitchell complained to Winski 3 times that her coworkers' radios were too loud; however, when Winski investigated, he found Mitchell was complaining about a radio playing approximately 30 feet from Mitchell's workstation and it was barely audible from her workstation. (*Id.*)  On that occasion, Mitchell left work because the radio noise had given her a headache. (*Id.*)  In the weeks prior to this incident, Mitchell also complained about low-level radio noise being made by radios located over 120 feet from her workstation. (*Id.* ¶ 32.)

Throughout her employment at GEHC, Mitchell presented various work restrictions including no lifting, pushing, pulling, or carrying more that 25 pounds, restrictions on working with the chemical Dymax Activator, and no overhead or shoulder level work.  (DPFOF ¶¶ 177-78.)  GEHC honored these restrictions and never required Mitchell to perform tasks incompatible with her restrictions.  (DPFOF ¶ 179.)  After 2003, Mitchell took several long-term leaves of absence from GEHC due to conditions unrelated to her headaches, and in July 2005, Mitchell left GEHC for health reasons unrelated to this case.  (Mitchell 2006 Dep. 14-18; Weide Aff. ¶ 25; DPFOF ¶ 176.)

Mitchell's personal physician, Dr. Jerry Yee, provided 3 letters to GEHC related to her conditions.  (Kruse Aff. Ex. A.)  The first letter, dated November 14,

2001, stated that wearing headphones would exacerbate Mitchell's migraine and sinus pressure conditions. (*Id.*) It is undisputed, however, that Dr. Yee did not perform any research regarding whether headphones would, in fact, exacerbate migraines or sinusitis, nor did he examine the headphones GEHC offered to Mitchell, or examine Mitchell prior to concluding that wearing headphones would exacerbate her condition. (Yee Dep. 17, 25-27.) Dr. Yee wrote that wearing headphones would exacerbate Mitchell's alleged conditions because that is what Mitchell reported to him. (*Id.* at 17, 25, 29-30.)

Dr. Yee's second letter, dated April 15, 2002, stated that "loud noises of any kind which includes radio sounds will aggravate or initiate [Mitchell's] headaches. . . . Ms. Mitchell's work environment should be relatively noise free." (Kruse Aff. Ex. B.) It is undisputed, however, that Dr. Yee never investigated whether radio noise was actually a triggering event for Mitchell's headaches, or tested Mitchell for her sensitivity to sound. (Yee Dep. 21-22.) Nor did Dr. Yee ever refer Mitchell to a neurologist or other expert to evaluate her headache condition or sensitivity to sound, or visit her work site to learn what the noise levels in her department were actually like. (*Id.* at 14, 16, 19-20, 34-35.) Dr. Yee's April 15, 2002 letter was based on Mitchell's self-report that radio noise triggered her headaches. (*Id.* at 22.)

On October 23, 2002, GEHC provided Dr. Yee with the September 2002 noise sampling data from the clean room where Mitchell worked. (Weide Aff. Ex. G.) Dr. Yee did not recall receiving this correspondence from GEHC and did not respond

-16-

as to whether it met his qualification for a "relatively noise free" work environment. (Yee Dep. 14.) Dr. Yee never provided a decibel level recommendation or restriction for Mitchell or an opinion as to what level of noise Mitchell could tolerate. (Yee Dep. 40-41; Weide Aff. ¶ 26.) On July 17, 2003, Mitchell's then supervisor, Ram Balasubramanian, asked Mitchell to update her medical information to include a diagnosis and any accommodation her physician recommended. (Mitchell 2003 Dep. 78-79.) Mitchell also recalled a nurse from GEHC asking her for more specific information as to how noise affected her. (Mitchell 2003 Dep. 76-77.) Mitchell, however, did not provide GEHC with any additional information at that time concerning a diagnosis or suggested accommodation because she thought "another letter wouldn't have helped." (Mitchell 2003 Dep. 75.)

Dr. Yee's third letter, dated March 3, 2004, advised that he believed Mitchell and GEHC should reach a "compromise" as to an acceptable decibel level for radios in the clean room. (Kingsley Aff. ¶ 9; Kingsley Aff. Ex. C.) In order to prevent Mitchell from being terminated as resigned, Dr. Yee also advised that Mitchell should return to work, but he did not recommend any work restrictions related to her headaches. (*Id.*) As of her February 24, 2006 deposition, Mitchell had not seen any physician for her headaches for approximately 2.5 years. (Mitchell 2006 Dep. 23.)

Mitchell filed a charge of discrimination with the State of Wisconsin Department of Workforce Development's Equal Rights Division ("ERD") on April 12, 2002, alleging discrimination on the basis of her disability, religion, and race, and

unlawful retaliation. The ERD investigated Mitchell's complaint and issued an initial determination on February 11, 2003, of no probable cause. (Kruse Aff. ¶ 4.) Mitchell appealed the initial determination and the matter was scheduled for a hearing to commence on December 9, 2003, however, prior to the hearing, Mitchell voluntarily dismissed her claims before the ERD. (*Id.*) On July 17, 2003, Mitchell filed a charge of discrimination with the Equal Employment Opportunities Commission ("EEOC"), solely alleging disability discrimination. (*Id.* at ¶ 5.) On January 2, 2004, the EEOC issued Mitchell a right to sue letter on her initial charge of discrimination filed with the ERD, and on January 29, 2004, the EEOC issued Mitchell a right to sue letter on her second charge of discrimination. (*Id.* at ¶¶ 4-5.) On April 4, 2004, Mitchell filed her complaint in this action asserting claims of religious discrimination under Title VII, and failure-to-accommodate and unlawful retaliation under the ADA. In a status conference on March 16, 2006, Mitchell notified the court that she withdrew her religious discrimination claims. (Docket # 48, Status Conf Mins.) Accordingly, Mitchell's remaining claims are whether GEHC failed to reasonably accommodate her alleged disability of headaches under the ADA, and whether GEHC retaliated against her for attempting to raise a good-faith claim under the ADA.

## ANALYSIS

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

-18-

(1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 256-57. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of [her] disability." 42 U.S.C. § 12112(a). In addition to prohibiting adverse employment actions against disabled persons because of their disabilities, the ADA requires employers to make reasonable accommodations for the disabilities of qualified individuals. 42 U.S.C. § 12112(b)(5)(A). It is important for plaintiffs to be clear about whether they are pressing disparate treatment or failure-to-accommodate claims (or both) because the two are analyzed differently. *See, e.g., Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572-73 (7th Cir. 2001); *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997).

Mitchell has not pressed a disparate treatment claim. In her brief in opposition

-19-

to the defendant's motion for summary judgment, Mitchell did not address or assert a disparate treatment disability discrimination claim. Instead, Mitchell pressed only her ADA claims of failure-to-accommodate and retaliation.

As a preliminary matter, GEHC asserts that Mitchell's claims regarding events that occurred prior to June 16, 2001, relate to discrete acts, and as such, they are time-barred under 42 U.S.C. § 12117(a). *See Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004) (holding that claims for discrimination under the ADA, like Title VII claims, must be filed within 300 days after the alleged unlawful employment practice occurred). Mitchell contends that GEHC's actions qualify as a continuing violation, and as such, the 300-day limitation period does not apply. *See id.* at 239 (holding that the continuing violation doctrine applies when the character of an employer's action does not become clear until it is repeated during the limitations period). However, because judgment is granted in favor of the defendant based upon a review of the merits of Mitchell's claims after examining all the defendant's actions that Mitchell complains of, the court does not address this particular argument.

Mitchell claims that GEHC failed to accommodate her disability in violation of the ADA. As a threshold requirement, Mitchell must first establish that she has a disability as defined by the ADA. Disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such

-20-

an impairment."  42 U.S.C. § 12102(2); *see also Hoffman*, 256 F.3d at 572.

Mitchell argues that she was disabled as defined by the ADA because she suffered from migraine, sinus, and stress headaches.  Mitchell claims her headaches affected major life activities such as her abilities to see, concentrate, and sleep, and the headaches made her sensitive to noise.  (PPFOF ¶ 33.)  In support of this claim, Mitchell cites to the affidavit of her personal physician, Dr. Yee.  (*Id*.)  Dr. Yee's affidavit states that Mitchell's headaches are permanent conditions, and that "these conditions collectively and individually affect major life activities such as concentration, sleep, sight sensitivity, noise sensitivity, and simple chronic pain in day to day living."  (Yee Aff. ¶ 9.)  Mitchell also states in her proposed findings of fact and affidavit that she suffered 2 to 3 migraine headaches per week and her headaches limited her ability to see, hear, concentrate, sleep, balance, and perform household chores such as grocery shopping, laundry, and cleaning.  (PPFOF ¶¶ 33-34; Mitchell Aff. ¶¶ 6-7.)  Additionally, Mitchell's counsel filed a letter along with a copy of a decision by the Social Security Administration finding that Mitchell was disabled.  (Docket # 71, Letter from Walter Stern.)  In his letter, Mitchell's counsel requests that the court take judicial notice of the severity of Mitchell's headaches.  (*Id*.)

GEHC asserts that Mitchell has not demonstrated that she was disabled as defined by the ADA.  GEHC claims that Dr. Yee's affidavit and attached materials do not establish that Mitchell was disabled under the ADA, because although the

-21-

medical documentation demonstrates that she was diagnosed with headaches, the documents do not discuss the effect of her headaches on any major life activities, or the frequency, duration, or severity of her headaches. GEHC also asserts that Mitchell has not provided any evidence that her alleged headaches *substantially* limit any major life activity to qualify as disabled under 42 U.S.C. § 12102(2).

To prove disability status, a plaintiff must submit more than evidence of a medical diagnosis of an impairment. *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 198 (2002). "Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Id.* (*quoting Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)). Also, the impairment's impact must also be permanent or long-term. *Id.*; 29 C.F.R. § 1630.2(j)(2).

Here, Mitchell has not presented objective evidence demonstrating that she was substantially limited in any major life activity. Although the activities identified by Dr. Yee qualify as major life activities, *see* 29 C.F.R. § 1630.2(I), Yee's affidavit and the attached medical records do not address the extent to which Mitchell's headaches limited her ability to perform those activities. Additionally, the conclusory allegations Mitchell makes in her own affidavit, indicating that her headaches created difficulties in her abilities to see, hear, concentrate, sleep, balance, and perform household chores (Mitchell Aff. ¶¶ 6-7), do not create a genuine issue of material fact. *See Contreras v. Suncast Corp.*, 237 F.3d 756, 764 (7th Cir. 2001) (holding

-22-

that the plaintiff must offer more than a "bald declaration" that his major life activities are limited to create a genuine issue of material fact as to whether the plaintiff was disabled).  Indeed, Mitchell does not point to evidentiary materials in the record discussing the duration or severity of her headaches, or describing how her headaches created difficulties in her abilities to perform the activities she identified.

The court cannot take judicial notice of the severity of Mitchell's headaches by reviewing the Social Security Administration decision filed by Mitchell's counsel. As a preliminary matter, the letter from Mitchell's counsel and attached decision did not provide the medical documentation and testimony that the decision references. Additionally, the decision found that Mitchell was disabled as of July 28, 2003, well after many of the events she complains of occurred.  (Docket # 71, Letter from Walter Stern.)  The disability determination also found several impairments in addition to "recurrent headaches" including degenerative disk disease, acrimoplasty in her shoulder, diabetes, carpal tunnel syndrome, chronic pain syndrome, and irritable bowel syndrome.  (*Id.*)  And other than noting that the headaches were recurrent, the decision does not provide any details regarding Mitchell's headaches. (*Id.*)  Finally, under Federal Rule of Evidence 201(b), a judicially noticed fact "must be one not subject to reasonable dispute."  *Id.*  Here, given the lack of objective evidence supporting Mitchell's claim that her headaches substantially limited her, GEHC reasonably disputes the severity of her headaches.  As such, the court is precluded from taking judicial notice of the severity of Mitchell's headaches.

-23-

"To survive summary judgment, a plaintiff must provide specific facts as to whether he is substantially limited in a major life activity . . . conclusory allegations will not do." *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006). Viewing the facts in the light most favorable to Mitchell as the record permits, Mitchell does not establish that her headaches substantially limited her ability to perform the major life activities she and Dr. Yee identified. Indeed, although Mitchell states in her affidavit that the headaches created difficulties for her in some activities, Mitchell has not provided any specific facts demonstrating the extent to which the headaches limited her. And contrary to her claim that she was limited by her headaches, Mitchell testified at her deposition that she was able to regularly attend and sing at church services, volunteer at a food pantry, attend weekly Bible study, watch television, and listen to music. (Mitchell 2003 Dep. 107-19.) In addition, Mitchell reported to Dr. Yee in 2000 that her headaches were "fairly well controlled." (Yee Aff. Ex. A, 5.) Furthermore, Mitchell listened to her own radio at her workstation, occasionally at high volume, and the quality of her work and her productivity had always been good. (Mitchell 2006 Dep. 55; Winski Aff. ¶¶ 15, 27, 29, Ex. B; PPFOF ¶ 30.) Because Mitchell does not present objective evidence demonstrating that her headaches substantially limited her in a major life activity, the court concludes that she has not established that she had a disability as defined by the ADA.

Even assuming Mitchell qualified as disabled under the ADA, she does not demonstrate that GEHC failed to reasonably accommodate her disability. In failure-

-24-

to-accommodate claims, the plaintiff, in addition to showing that she is a qualified individual with a disability, must show that the employer was aware of her disability and still failed to reasonably accommodate it. *Hoffman*, 256 F.3d at 572. Here, it is undisputed that GEHC did a variety of things to address Mitchell's complaints about radio noise and accommodate her headaches. Specifically, GEHC re-communicated the radio usage guidelines to the clean room employees, trained all supervisors on acceptable radio volume, twice conducted noise sampling in the clean room, offered Mitchell hearing protection multiple times, asked her and her physician for specific information about her sensitivity to noise and what noise level she could be exposed to, offered to set a specific decibel level for all workstation radios, and turned down her coworkers' radios when they were too loud. (Kingsley Aff. ¶ 7; Schmidt Aff. ¶ 5; Winski Dep. 38-39; Mitchell 2003 Dep. 76-79.)

Despite these efforts, Mitchell maintains that GEHC failed to reasonably accommodate her headaches. It appears that Mitchell would accept only accommodations that would require her coworkers to wear radio headphones or to turn their radios down or off when she felt the radio noise was exacerbating her headaches. (Pl.'s Resp. Br. 11.) This accommodation, however, would impose an impractical and unreasonable obligation upon GEHC. Given that Mitchell's tolerance for radio noise varied, as demonstrated by her practice of occasionally listening to her radio at a high volume, GEHC would never be able to achieve more than temporary compliance because its compliance would depend entirely upon Mitchell's

-25-

tolerance for background noise at any given moment. *See, e.g.*, *Vandeveer v. Fort James Corp.*, 192 F. Supp. 2d 918, 940 (E.D. Wis. 2002) (holding that asking an employer to reduce the "stress" of the workplace is not a reasonable accommodation, in part, because the employer could never achieve more than temporary compliance because compliance would depend entirely on the [plaintiff's] stress level at any given moment), *aff'd*, 66 Fed. Appx. 16 (7th Cir. 2003). Additionally, as the Seventh Circuit explained in *EEOC v. Yellow Freight System, Inc.*, 253 F.3d 943 (7th Cir. 2001), "an employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Id.* at 951. Furthermore, although the radios may have occasionally been at volumes that Mitchell considered to be loud, and the radio noise exacerbated her headaches (Taylor Aff. ¶¶ 8-17), Mitchell provides no evidence suggesting that GEHC failed to turn down the volume on radios that were determined to be louder than surrounding manufacturing noise, or that GEHC failed to take effective measures to keep radio volumes in the clean room at acceptable levels as described by its radio usage guidelines. (Winski Dep. 10, 20-21, 38-39; Winski Aff. ¶¶ 12-14; Kingsley Aff. Ex. A.)

After an employee makes his or her employer aware of a disability, "the ADA obligates the employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *EEOC. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (citations omitted). Where

an employer takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate or withholds essential information. *Id.* at 806.

Here, it is undisputed that Mitchell refused to wear any type of hearing protection offered to her, and she did not provide GEHC with specific information regarding her sensitivity to noise and what noise level she could be exposed to even though GEHC had requested such information. (Mitchell 2003 Dep. 75-79; Weide Aff. ¶ 26.) When asked at her deposition why she did not provide specific information concerning a diagnosis or suggested accommodation, Mitchell responded that "another letter wouldn't have helped." (Mitchell 2003 Dep. 75.) However, no prior letter to GEHC suggested any specific limitations regarding noise levels she could not be exposed to, and Dr Yee's April 15, 2002 letter to GEHC simply stated that Mitchell's work environment "should be relatively noise free." (Kruse Aff. Ex. B.) Furthermore, in response to Dr. Yee's request that Mitchell's environment "be relatively noise free," GEHC provided Dr. Yee with the September 2002 noise sampling data from the clean room where Mitchell worked. (Weide Aff. Ex. G.) Dr. Yee, however, never provided GEHC with a decibel level recommendation or restriction for Mitchell. (Yee Dep. 40-41.) And Mitchell did not request that Dr. Yee or another physician provide GEHC with the specific information GEHC requested.

As the Seventh Circuit held in *Hoffman*, the ADA requires an employer to

make whatever accommodations are reasonably possible in the circumstances to allow the employee to perform the essential functions of her position. 256 F.3d at 577. In the instant case, the record demonstrates that GEHC made several reasonable accommodations that allowed Mitchell to perform the essential functions of her position. Indeed, Mitchell states that the quality of her work and her productivity had always been good. (PPFOF ¶ 30.) Additionally, GEHC made good-faith efforts to have Mitchell suggest additional appropriate accommodations so that she could continue to function well in her position. Because Mitchell did not make good-faith attempts at engaging in the interactive process to determine the appropriate accommodation for her headaches, Mitchell cannot prevail on her failure-to-accommodate claim. Specifically, Mitchell did not provide GEHC with the specific information it requested so that GEHC could make an informed decision about how to reasonably accommodate her headaches. Instead, Mitchell insisted on the impractical and unreasonable accommodation that she be permitted to determine on a daily basis the volume of her coworkers' radios, and on days that she could not tolerate any radio noise, that her coworkers who wanted to listen to a radio be required to wear radio headphones. And Mitchell did not make good-faith efforts to explore alternative accommodations that would not subject GEHC to impractical and unreasonable obligations based upon Mitchell's varying tolerance for background noise. *See, e.g.*, *Vandeveer*, 192 F. Supp. 2d at 940. Indeed, it is undisputed that Mitchell refused to even test the use of hearing protection

-28-

headphones on a trial basis.  (Krammer Aff. ¶¶ 7, 10.)

Even though Mitchell's failure-to-accommodate claim fails, and the court finds that Mitchell's headaches did not make her disabled within the meaning of the ADA, she may still raise a viable retaliation claim if she can demonstrate that GEHC retaliated against her for attempting to raise a good-faith claim under the ADA.  *See Cassimy v. Bd. of Educ.*, 461 F.3d 932, 938 (7th Cir. 2006).  Mitchell claims that she was a victim of unlawful retaliation, asserting that she suffered adverse employment actions as a result of complaining about the volume of her coworkers' radios. (Mitchell 2006 Dep. 42.)

The ADA prohibits retaliation against any individual who has opposed an act or practice made unlawful by the ADA.  42 U.S.C. § 12203(a).  A plaintiff has two routes to establish a retaliation claim.  *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  One is to present direct evidence, or "evidence that establishes without resort to inferences from circumstantial evidence," that the plaintiff engaged in protected activity and as a result suffered the adverse employment action of which the plaintiff complains.  *Id.*  In the second route, the plaintiff must demonstrate that after the plaintiff engaged in a statutorily protected activity, the plaintiff was treated less favorably than other similarly situated employees who did not engage in the protected activity, even though the plaintiff was performing his or her job in a satisfactory manner.  *Id.*; *see also Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).  If the plaintiff establishes

-29-

these elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action. *Stone*, 281 F.3d at 644. Once the defendant presents a legitimate, non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual. *Id.*

Mitchell does not present direct evidence of retaliation, but she proceeds under the indirect method of proof, asserting that GEHC subjected her to a number of adverse employment actions in retaliation for complaining about radio noise. Specifically, Mitchell asserts that GEHC retaliated against her by: (1) referring her to the Employee Assistance Program which included placing her on leave of absence from April 26, 2001, to June 16, 2001, (2) reading the zero tolerance warning and last chance agreement to her, and (3) "keeping [her] off work, because [GEHC] would not require its employees to wear headphones." (Pl.'s resp. Br. 8.) Although Mitchell's complaint alleges that less senior employees were trained on the module final process before she was eventually trained on that process, Mitchell did not address the issue of training in her brief.

GEHC asserts that Mitchell's retaliation claim must fail because she did not engage in a statutorily protected activity. GEHC asserts that because most of Mitchell's complaints concerning radio noise were about radios playing at low volumes, and some of her complaints were about radios that were not even turned on, Mitchell did not raise a "good-faith" claim under the ADA. *See Cassimy*, 461

-30-

F.3d at 938.  GEHC also asserts that Mitchell did not suffer an adverse employment action.  GEHC claims that the employer actions Mitchell complains of did not constitute adverse employment actions because the referral to the Employee Assistance Program and the reading of the zero tolerance warning and the last chance agreement to her did not create a material change in Mitchell's job.

In *Traylor v. Brown*, 295 F.3d 783 (7th Cir. 2002), the Seventh Circuit defined an adverse employment action as:

> more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. . . .  Of course, not everything that makes an employee unhappy will suffice to meet the adverse action requirement. . . .  Rather, an employee must show that material harm has resulted from the challenged actions.

*Id.* at 788 (citations omitted).

Here, Mitchell's verbal zero tolerance warning, and the last chance agreement did not subject her to any obligations above and beyond those imposed on regular employees: Mitchell was only required to comply with GEHC's work rules and to treat her coworkers in a nonintimidating manner.  Additionally, Mitchell's claim that GEHC kept her off work does not entirely refer to employment actions; rather, some of Mitchell's medical leaves of absence were imposed by her physicians, not GEHC, and the leaves of absence were related to medical conditions apart from her headaches.  (Mitchell 2003 Dep 6-8.)  However, Mitchell's referral to the Employee

-31-

Assistance Program, which included being placed on leave of absence from April 26, 2001, to June 16, 2001, was certainly "more disruptive than a mere inconvenience or an alteration of job responsibilities" and may have led to material, although temporary, harm to her employment. *See Traylor*, 295 F.3d at 788. Accordingly, even though Mitchell was paid for the amount of time she was placed on leave of absence and she suffered no change in her pay or benefits, viewing the facts in the light most favorable to Mitchell, the court concludes that the referral to the Employee Assistance Program with the mandatory leave of absence may qualify as an adverse employment action. GEHC, however, has demonstrated a legitimate, non-invidious reason for referring Mitchell to the Employee Assistance Program, and Mitchell has not shown that GEHC's proffered reason is a pretext for discrimination.

A pretext, in employment law, is a "phony reason" that the employer offers for engaging in discriminatory conduct. *Mills v. First Fed. S & L Ass'n*, 83 F.3d 833, 845 (7th Cir. 1996). "A plaintiff can prove that an employer's proffered reasons for an employment decision are pretextual by one of two methods: (1) by showing that a discriminatory reason more likely than not motivated the employer, or (2) that the employer's proffered explanation is unworthy of credence." *Id.* (citations omitted).

Mitchell asserts that it is more likely than not that discriminatory reasons motivated GEHC to refer her to the Employee Assistance Program. In support of this claim, Mitchell simply states that a review of her affidavit, the affidavits of Taylor and Dr. Yee, and the medical reports attached to Dr. Yee's affidavit demonstrate that

-32-

"it is clear that the more the plaintiff complained, the more the plaintiff got disciplined and/or the more the plaintiff had to miss work." However, a review of these documents does not suggest that it is more likely than not that discriminatory reasons motivated GEHC to refer her to the Employee Assistance Program. Additionally, the court notes that it is not obliged "to scour the record looking for factual disputes." *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001).

GEHC states that it referred Mitchell to the Employee Assistance Program because it reasonably believed the reports from Mitchell's coworkers that she was intimidating them and arguing with them, and that Mitchell's behavior had become disruptive. (Weide Aff. ¶¶ 7, 8, 17, 18.) Mitchell asserts that this reason "was phony, in that the psychotherapist [in the Employee Assistance Program] did not feel that the plaintiff needed any more sessions . . . ." (Pl.'s Resp. Br. 9.) However, Mitchell does not present evidence suggesting that the above reason for referring her to the program is "phony." Indeed, it is undisputed that Mitchell's coworkers reported that she was staring, glaring, yelling, and otherwise intimidating them when GEHC referred Mitchell to the Employee Assistance Program and when GEHC read her the zero-tolerance warning and the last chance agreement. In addition, GEHC had no reason to not believe Mitchell's coworkers' complaints. Furthermore, Mitchell does not dispute that she had been disrespectful toward management by raising her voice to Winski and had refused to follow a work directive by refusing to report to Winski's office when told to do so. (Weide Aff. ¶¶ 9, 11, Ex. C; Winski Aff. ¶ 23.) As such,

-33-

although Mitchell may have not actually benefitted from the counseling services provided in the Employee Assistance Program, Mitchell has not shown that a discriminatory reason more likely than not motivated GEHC to refer her to the program, or that the GEHC's proffered explanation is unworthy of credence.

In conclusion, Mitchell's retaliation claim fails because GEHC demonstrated a legitimate, non-invidious reason for referring Mitchell to Employee Assistance Program and placing her on leave of absence: Mitchell's coworkers reported that she was disruptive and intimidating them and Mitchell had raised her voice to her manager and refused to comply with his directive. In addition, as noted above, Mitchell has not demonstrated that she was substantially limited in any major life activity by her headaches, or that GEHC failed to reasonably accommodate her headaches. Because the record would not permit a reasonable jury to conclude that Mitchell was disabled within the meaning of the ADA, that GEHC failed to reasonably accommodate her headaches, or that the reasons provided by GEHC for referring her to Employee Assistance Program are pretextual, the court is obliged to grant GEHC's motion for summary judgment.

Accordingly,

-34-

**IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 51) be and the same is hereby **GRANTED** and this action be and the same is hereby **DISMISSED** with prejudice, together with costs as taxed by the clerk of the court.

The clerk of the court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this  23rd  day of February, 2007.

BY THE COURT:

 s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge